**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| v. | ) | Criminal No. 13-173 |
| | ) | |
| JAISON EVANS, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## OPINION

### I.  Introduction

Pending before the court is a pro se motion filed by Jaison Evans ("Evans") for immediate release from the sentence of imprisonment he is currently serving at FCI-Elkton (ECF No. 167), and brief in support (ECF No. 172).   Evans seeks compassionate release for "extraordinary and compelling reasons" pursuant to the First Step Act and 18 U.S.C. § 3582(c)(1)(A)(i), due to the COVID-19 virus.    The court received numerous letters of support from Evans' family members, pastor and friends.  The government filed an expedited response opposing the motion (ECF No. 169).

### II.  Procedural History

Evans pled guilty to count 2 of the indictment at Criminal Number 13-173, which charged him with possession with intent to distribute 100 grams or more of heroin under 21 U.S.C. §§ 841(a)(1) & 841(b)(1)(A)(viii), as part of a Rule 11(c)(1)(C) plea agreement entered into with the government. Evans acknowledged his responsibility for the conduct charged in counts 1 and 3 of the indictment.  In the plea agreement, Evans consented to voluntarily forfeit the following: (1) $430,000.00 in United States currency; (2) $58,323.21 seized from PNC Bank Account #1031625278; (3) $1,434.94 seized from PNC Bank Account #1025390329; (4)

$5,782.27 seized from PNC Bank Account #097078174; (5) $11,308.22 seized from PNC Bank Account #097078689; (6) one steel and gold colored Omega Constellation Co-Axial Chronometer; (7) a 2003 Lincoln Navigator, VIN #5LMFU28R33LJ05933; and (8) a North American Arms .380 caliber firearm, bearing serial number BC01658. Evans acknowledged that this property constituted the proceeds of criminal drug distribution. On November 13, 2014, the court conducted a thorough colloquy and accepted Evans' guilty plea as knowing and voluntary.

On March 13, 2015, Evans was sentenced to a term of imprisonment of 144 months and 10 years of supervised release, pursuant to the agreed-upon sentence in the plea agreement. This represented a significant downward variance from the advisory guideline range of 262-327 months, which was based on Evans' classification as a career offender. The statutory mandatory minimum sentence is 120 months.

Evans has completed approximately 87 months of his sentence. His projected release date is August 23, 2023. https://www.bop.gov/mobile/find_inmate/byname.jsp#inmate_results (last visited September 23, 2020).

On May 19, 2020, Evans filed a 1-page motion for appointment of counsel to help him file a compassionate release motion (ECF No. 162). On June 30, 2020, the court denied the motion without prejudice and noted that the Federal Public Defender's office informed the court by email that it did not intend to file a motion for compassionate release on Evans' behalf (ECF Nos. 165, 166). The court explained that it would reevaluate its decision if Evans filed a substantive motion for relief. Evans responded by filing the instant pro se motion for release (ECF No. 167) and a supplement (ECF No. 172). The motion and supplement are well-written and thorough.

In its June 30, 2020 opinion, the court noted that Evans failed to show how he exhausted

his administrative remedies.  On August 5, 2020, the court appointed counsel on Evans' behalf.  Counsel did not supplement Evans' arguments on the merits, but focused on the arguments about exhaustion of administrative remedies.  On August 18, 2020, the court held a hearing on Evan's motion and requested further briefing on the exhaustion issue.  The government changed its position and conceded that Evans exhausted his administrative remedies, but continued to oppose his release.  Evan's motion is now ripe for disposition.

III. Exhaustion

Evans represents that he satisfied his administrative remedies by making an email request[1] to the warden at FCI Elkton "which was denied [on] April 30, 2020, stating that he did not meet the criteria" (ECF No. 167 at 4; 167-7).  Evans acknowledges that the warden denied his request in writing and attached that decision to his motion (ECF No. 167-7).  There is no evidence that Evans commenced an appeal of the warden's decision.  Evans filed the pending motion for relief in this court on July 23, 2020.

The government originally contended (and the court agreed) that Evans failed to exhaust his administrative remedies because he did not appeal the denial to the BOP Regional Director's office and Office of General Counsel pursuant to 28 C.F.R. §§ 542.15 and 571.63.  On August 31, 2020, the court of appeals designated its decision in *United States v. Harris*, No. 20-1723, -- F.3d --, 2020 WL 5198870 (3d Cir. 2020), as precedential.  In *Harris*, the court of appeals held that a defendant may file a compassionate release motion with the court 30 days after the warden receives his initial request.  *Id.*  Based on *Harris*, the court reconsiders its prior decision about exhaustion.  Because Evans filed his motion in this court more than 30 days after the warden

---

[1] The date of Evans' request is unclear from the record.  It appears that he inadvertently scanned the second page of his email twice (*see* ECF No. 167-6).

received his initial request, he exhausted his administrative remedies and his motion for

compassionate release will be resolved on the merits.

IV. Legal Standard

The First Step Act provides, in relevant part, that the court may not modify a term of

imprisonment once it has been imposed, unless:

> (A)    the court, upon motion of the Director of the Bureau of Prisons, or upon
> motion of the defendant after the defendant has fully exhausted all
> administrative rights to appeal a failure of the Bureau of Prisons to bring a
> motion on the defendant's behalf or the lapse of 30 days from the receipt of
> such a request by the warden of the defendant's facility, whichever is earlier,
> may reduce the term of imprisonment (and may impose a term of probation or
> supervised release with or without conditions that does not exceed the
> unserved portion of the original term of imprisonment), **after considering the
> factors set forth in section 3553(a)** to the extent that they are applicable, **if** it
> finds that—
>
> (i)    **extraordinary and compelling reasons** warrant such a reduction; **or**
>
> (ii) the defendant is at least 70 years of age, has served at least 30 years in
> prison, pursuant to a sentence imposed under section 3559(c), for the
> offense or offenses for which the defendant is currently imprisoned, **and** a
> determination has been made by the Director of the Bureau of Prisons that
> the defendant is not a danger to the safety of any other person or the
> community, as provided under section 3142(g);
>
> **and** that such a reduction is consistent with applicable **policy statements** issued
> by the Sentencing Commission.

18 U.S.C. § 3582(c)(1)(A)(i) (emphasis added).  Under the statute, the court must address three

considerations:  (1) the § 3553(a) factors; (2) whether extraordinary and compelling reasons

exist; and (3) whether a reduction is consistent with policy statements of the Sentencing

Commission.

Evans bears the burden of proof by a preponderance of the evidence.  *United States v.*

*Weaver*, No. 1:17-CR-235, 2020 WL 4810123, at *2 (E.D. Va. Aug. 18, 2020) ("As the party

seeking relief and with no statutory guidance otherwise, a defendant bears the burden of proof in motions for compassionate release.") (citing *Schaffer ex rel. Schaffer v. Weast*, 546 U.S. 49, 56-57 (2005)); *United States v. Rodrigues*, No. 16-CR-00529-DKW-1, 2020 WL 5634310, at *1 (D. Haw. Sept. 21, 2020). Each of the three considerations will be addressed.

V. Discussion

A. Section 3553(a) Factors

The statute states that a court does not evaluate whether extraordinary and compelling reasons justify a sentence reduction until "**after**" it considers the sentencing factors set forth in 18 U.S.C. § 3553(a).

The court reviewed the § 3553(a) factors on March 13, 2015, when imposing sentence on Evans. Regarding the nature and circumstances of the offense and the history and characteristics of the defendant, the court recognized that the defendant was involved in a very serious drug conspiracy, involving large quantities of heroin and money, as well as guns. The court noted that defendant had two prior felony drug convictions, which made the court question whether the plea agreement should be accepted. The court gave defendant the benefit of the plea agreement based upon the defendant's sentencing memorandum and the letters and certificates attached, which demonstrated defendant's commitment to his faith and to not returning to the drug culture, and his strong family support. The court determined that a 12-year term of imprisonment, followed by 10 years of supervised release, reflected the need to protect the public from further crimes of the defendant, provide just punishment for and adequate deterrence to criminal conduct, and provide defendant with needed treatment and education. The court considered a fine, but determined defendant did not have the ability to pay a fine. The court determined that although

the sentence imposed was a substantial downward variance, any sentence disparities among defendants with similar records who have been found guilty of similar conduct were warranted by the policies with respect to binding plea agreements.  Evans was required to forfeit over $500,000, a luxury watch and vehicle, and other items.  Restitution was not applicable.

Evans asks the court to consider his post-sentence rehabilitation while incarcerated.  The statutory command in 18 U.S.C. § 3661 that "[n]o limitation ... be placed on the information concerning the background, character, and conduct" of a defendant that a district court may "receive and consider for the purpose of imposing an appropriate sentence" applies equally to resentencing proceedings.  *Pepper v. United States*, 562 U.S. 476, 490–91 (2011).  In *Pepper*, the Supreme Court explained that post-sentencing rehabilitation is relevant to numerous § 3553(a) factors, including the history and characteristics of the defendant,  deterrence, protection of the public and rehabilitation, and "may also critically inform a sentencing judge's overarching duty to "impose a sentence sufficient, but not greater than necessary," to comply with the sentencing purposes."  *Id.* at 491; *See United States v. Tidwell*, No. CR 94-353, 2020 WL 4504448, at *7 (E.D. Pa. Aug. 5, 2020) (court's review of the § 3553(a) factors must consider the "most up-to-date picture" of the defendant's "history and characteristics," including evidence of rehabilitation).

The court will, therefore, consider Evans' post-sentence rehabilitation.  The court accepts that his discipline-free conduct during his present sentence (in contrast to the multiple infractions he had during each of his two prior convictions, *see* ECF Nos. 172 at 4; 167-7 at 96) is evidence that he has matured and grown as a person (ECF No. 172 at 5).  The court also takes notice of his PATTERN score, which reflects low risk of violence, his responsible job as the warden's orderly, his vocational classes in carpentry and study for the CDL, his ownership of a janitorial

services company and access to gainful employment, his ability to reside with his wife if released, and the love and support of his family and community, as reflected in the letters of support.

The court recognizes that Evans has many admirable personal qualities. Those personal characteristics must be balanced with the nature of the offense, and the other sentencing factors. Evans engaged in large scale heroin trafficking, involving large amounts of cash and guns. Heroin is devastating to the community because it is so addictive and ruins the lives of addicts and their families. *See United States v. Brinson*, No. CR 15-87, 2020 WL 4736258, at *5 (W.D. Pa. Aug. 14, 2020) (denying compassionate release motion because heroin trafficking and guns pose a substantial risk of harm to the community).

The overarching reason for the original sentence imposed was the parties' binding plea agreement. Because the crime posed such a grave danger to the community and Evans had two prior convictions for similar conduct, the court had doubts about accepting the substantially reduced sentence agreed upon by the parties. The court gave great weight to Evans' commitment to his faith, reduced likelihood of recidivism and family support in accepting the plea agreement. The court determined that imprisonment for 12 years was sufficient, but no greater than necessary, to accomplish the purposes of sentencing. Evans now asks the court to further reduce his sentence below that imposed by the plea agreement and below the statutory mandatory minimum. Ultimately, after reevaluation of all the § 3553(a) factors, the court concludes that a further reduction of Evans' term of imprisonment would not be appropriate.

B. Extraordinary and compelling reasons

Evans cites two related reasons for compassionate release: (1) the outbreak of COVID-

19 at FCI-Elkton; and (2) his medical conditions, including contracting COVID-19. The court will address each of these contentions.

### 1. Outbreak at FCI-Elkton

The court takes judicial notice of the evidentiary record developed recently in *United States v. Grasha*, No. 18-325, 2020 WL 5747829 (W.D. Pa. Sept. 24, 2020):

> Sarah Dees, the health services administrator at FCI-Elkton, testified credibly at the hearing. She agreed that in March and April 2020 (shortly after Evans reported) a high number of inmates tested positive and had severe health conditions related to the COVID-19 virus. In total, beginning in March 2020 to the present, there have been 950 positive tests for the COVID-19 virus among inmates at FCI-Elkton. Tr. at 79. At its peak, 50 inmates were in the hospital and 9 inmates died from the COVID-19 virus. Tr. at 54, 81. The last inmate death occurred on May 7, 2020. Tr. at 98. It has been months (more than 60 days) since any inmate was sent to the hospital due to the COVID-19 virus. Tr. at 96-97. The inmates currently hospitalized were part of the initial group sent to the hospital in March and April 2020 and have remained hospitalized since that time. Tr. at 96.

> Ms. Dees explained that FCI-Elkton implemented numerous measures to combat the pandemic in accordance with CDC guidance, including surveillance testing of all inmates during the initial outbreak in March and April 2020. Tr. at 55. Ninety percent of the inmates were placed in either isolation or quarantine. Tr. at 55. FCI-Elkton requires handwashing, wearing masks and social distancing. Tr. at 57-59.

> Each inmate is confined to a cohort.[2] Each cohort contains approximately 150 inmates who are housed in a unit separate from other cohorts. Tr. at 83. At FCI-Elkton, there is movement within a cohort, but an inmate does not have any contact with persons in another cohort. Tr. at 101. The cohorts obtain their food at separate times and the facility is cleaned between each cohort going to the dining room. Tr. at 101. Cohorts receive educational programming and recreate at separate times from other cohorts. Tr. at 101.

> Currently, only 5 of the approximately 2500 inmates at FCI-Elkton are positive for the COVID-19 virus, and they are in isolation. Tr. at 57. *See*

---

[2] The government defines a cohort as "a group of persons with a similar condition grouped or housed together for observation over a period of time." *Nat'l Immigration Project of Nat'l Lawyers Guild v. Exec. Office of Immigration Review*, No. 1:20-CV-00852 (CJN), 2020 WL 2026971, at *2 (D.D.C. Apr. 28, 2020) (citing ICE Pandemic Response at 4 n.3).

> bop.gov/coronavirus/index.jsp (last visited September 15, 2020) (current COVID infections are 5 inmates, 2 staff). Those 5 inmates were asymptomatic and were subjected to a routine COVID-19 virus test prior to their step down from the facility. Tr. at 102.

*Id.* at *3.

Evans reports that he is one of 80 inmates housed at FSL Elkton, a low security satellite camp, and has outside the gate work privileges (ECF No. 167 at 1). During the peak of the outbreak, Evans' friend and workout partner died from COVID-19 (ECF No. 167 at 2). There is no information in the record about whether Evans is <u>currently</u> being exposed to COVID-19.

The court concludes that the <u>current</u> status of the COVID-19 pandemic at FCI-Elkton does not arise to an extraordinary and compelling reason for release. *Accord United States v. Thomason*, No. 19-CR-05, 2020 WL 4915833, at *2 (D. Minn. Aug. 21, 2020) ("FCI-Elkton was the site of a significant COVID-19 outbreak during which nine inmates died and has since been the subject of extensive litigation, but the situation there has improved.").

### 2. Medical conditions

Evans cites the following medical conditions as a basis for compassionate release: (1) contracting COVID-19; (2) history of hypertension; (3) chronic migraines; and (4) obesity. Evans also points to his father's death at age 53 and various other conditions that "run rampant" on both sides of his family (ECF No. 167-7 at 94).

### a. COVID-19

Evans believes that he contracted the COVID-19 virus in March 2020. He was not tested at that time, but experienced a number of symptoms including 15 days of severe headaches and a cough which he still had 4 months later. (ECF No. 167 at 3). Evans reports that when testing began in May 2020, his first two COVID-19 results were negative, but a third test taken on July 1, 2020, was positive. *Id.* Other than the persistent cough, Evans does not report current

symptoms.  He does express concern that the virus may progress into a "more serious phase" and cause serious lung damage or worse (ECF No. 167 at 4).  Evans requested, but did not receive, a chest x-ray.

In *United States v. Hilts*, No. CR 11-133, 2020 WL 4450373, (W.D. Pa. Aug. 3, 2020), the court denied compassionate release in a similar situation in which an inmate tested positive for COVID-19 and recovered. The court reasoned that because there was no indication that the inmate suffered from complications, any COVID-19 risk posed to him was minimized. *Id.* at *2 (citing *United States v. Lavatai*, 2020 WL 427528, at * 3 (D. Hawaii July 24, 2020) ("the combination of Lavatai's lack of complications after testing positive and the possibility that he may have some form of immunity cannot be entirely ignored in any evaluation of whether there are extraordinary and compelling reasons warranting a reduction in his sentence."); *United States v. Kreitzman*, 2020 WL 4368191, at *3 (N.D. Cal. July 30, 2020) ("Krietzman's infection, and recovery, from COVID-19 is not a medical condition that qualifies as an 'extraordinary and compelling reason' ... to modify his sentence."); and *United States v. Kelley*, 2020 WL 2747887 (N.D. Cal. May 27, 2020) (denying compassionate release to a defendant who already recovered from COVID-19)).

In *United States v. Davidson*, No. 2:16-CR-00139-2, 2020 WL 4877255, at *20 (W.D. Pa. Aug. 20, 2020), the court reached a different conclusion and granted compassionate release based on inmate's serious, chronic and progressive medical conditions which put him in the "high risk" category with respect to COVID-19, even though the inmate had contracted and recovered from COVID-19.  The court noted the medical uncertainty about how long the "immunity certificate" from contracting the COVID-19 virus will last and whether "recovered" status ensures that he is not suffering from lingering or latent effects of the virus.  *Id.*

In *Lavatai*, the court surveyed the current research about whether a person can be

reinfected with COVID-19:

> More recent articles, however, have indicated that individuals infected with
> COVID-19 are likely to remain immune even after their antibody count drops. As
> one article put it, "[a] decline in antibodies is normal after a few weeks, and
> people are protected from the coronavirus in other ways." Apoorva
> Mandavilli, *Can You Get COVID-19 Again? It's Very Unlikely, Experts Say*, N.Y.
> Times, July 22, 2020, https://www.nytimes.com/2020/07/22/health/COVID-
> antibodies-herd-immunity.html; *see also* Derek Thompson, *How Long Does
> COVID-19 Immunity Last?*, The Atlantic, July 20, 2020,
> https://www.theatlantic.com/ideas/archive/2020/07/could-COVID-19-immunity-
> really-disappear-months/614377/; Martin Finucane, *Here's What You Need To
> Know About Fading Coronavirus Antibodies*, Boston Globe, July 23, 2020,
> https://www.bostonglobe.com/2020/07/23/nation/heres-what-you-need-know-
> about-fading-coronavirus-antibodies/. Even after COVID-19 antibodies decline,
> the body might retain immunological memory that allows it to quickly produce
> new antibodies to respond to a second infection. *See Id.* Some experts therefore
> posit that, at the very least, it is highly unlikely that individuals will contract the
> coronavirus twice. *See Id.*

2020 WL 4275258 at *3.  The most recent CDC guidance about the risk of catching COVID-19

twice states:

> At this time, we have limited information about reinfections with the virus that
> causes COVID-19. This is a new virus, and CDC is actively working to learn
> more. We will provide updates as they become available. Data to date show that a
> person who has had and recovered from COVID-19 may have low levels of virus
> in their bodies for up to 3 months after diagnosis. This means that if the person
> who has recovered from COVID-19 is retested within 3 months of initial
> infection, they may continue to have a positive test result, even though they are
> not spreading COVID-19.
>
> There are no confirmed reports to date of a person being reinfected with COVID-
> 19 within 3 months of initial infection. However, additional research is ongoing.
> Therefore, if a person who has recovered from COVID-19 has new symptoms of
> COVID-19, the person may need an evaluation for reinfection, especially if the
> person has had close contact with someone infected with COVID-19. The person
> should isolate and contact a healthcare provider to be evaluated for other causes
> of their symptoms, and possibly retested.

https://www.cdc.gov/coronavirus/2019-ncov/hcp/duration-
isolation.html#:~:text=At%20this%20time%2C%20we,%2C%20and%20possibly%20retested.
(updated Sept 10, 2020, last visited Sept. 28, 2020).

The court notes that Evans is not symptom-free, because he has a persistent cough.  That symptom, by itself, does not appear to pose serious health risks or prevent Evans from engaging in self-care.  On this record, the fact that Evans contracted and mostly recovered from COVID-19 does not justify compassionate release.

b.  Hypertension

Evans states that he has a history of hypertension.  The CDC states:  "Having other cardiovascular or cerebrovascular disease, such as hypertension (high blood pressure) or stroke, may increase your risk of severe illness from COVID-19."

https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html#serious-heart-conditions (last visited Sept. 28, 2020).

The medical records provided by Evans (ECF No. 167-7) reflect that he has "hypertension, benign essential."  The term "benign hypertension" means it is usually of slight to moderate severity and of long duration, and is usually asymptomatic.  www.auanet.org › auauniversity › renovascular-diseases (last visited Sept. 28, 2020).  When Evans reported to FCI-Elkton in 2015, he was taking aspirin and Lisinopril once a day for his hypertension, which began in his thirties (ECF No. 167-7 at 88).  He did not have any cardiovascular symptoms.  *Id.*  In October 2015, his hypertension was "resolved" by weight loss and his medications were discontinued (ECF No. 167-7 at 65-66).  Evans' BMI at that time was 28.  There is no indication that Evans had any further treatment for hypertension.  The only medical problems at FCI-Elkton (until the positive COVID-19 test) consisted of acute pharyngitis and a migraine headache in December 2019 (ECF No. 167-7 at 5).  An examination on December 26, 2019, revealed no pulmonary or cardiovascular problems (ECF No. 167-7 at 8).  On this record Evans' benign hypertension, which was resolved in 2015, does not constitute an extraordinary and compelling reasons for

compassionate release.

### c.   Migraines

Evans points to a history of chronic migraines as a basis for release.  As noted above, the medical records he provided reflect only one complaint of a migraine since he reported to FCI-Elkton in 2015.  In addition, there is currently no evidence to suggest that people who have migraine have an increased risk for COVID-19.  Migraines are not on the CDC's list of conditions that, based on current research, may put a person at increased risk for serious COVID-19 illness. https://www.healthline.com/health/headache/coronavirus-migraines#causes (last visited Sept. 29, 2020).  In sum, Evans' migraines do not constitute an extraordinary and compelling reason for compassionate release.

### d.   Obesity

Evans contends that he is obese because he has a Body Mass Index ("BMI") of 31.  BMI provides a rough estimate of body fat simply by comparing height and weight. https://www.nhlbi.nih.gov/health/educational/lose_wt/bmitools.htm (last visited Sept. 28, 2020). It may overestimate body fat in athletes and others who have a muscular build.  *Id.*

In *Grasha*, the court accepted testimony from Dr. Amesh Adalja, an expert in the fields of infectious diseases, critical care and pandemic response, that individuals with obesity are at higher risk of having a severe case of COVID-19.  Grasha, 2020 WL 5747829 at *4.   A person with a BMI of 48 (i.e., morbidly obese), poses greater concern than a person with a BMI of 31 (i.e., slightly obese), like Evans.  *Id.*  Because Evans is in a congregate setting (a prison), he is at higher risk of contracting the COVID-19 virus.  *Id.*  In fact, Evans did contract COVID-19.

Evans' BMI puts him slightly into the obese category and in 2015 he had the complicating factor of hypertension.  The record does not reflect whether Evans has high body

fat or his BMI is driven by his workouts or a muscular frame.  His BMI was 28 in 2015, when

his hypertension was "resolved" (ECF No. 167-7 at 66).  In addition, Evans already contracted

COVID-19 without experiencing a severe reaction.  The court concludes that Evans's obesity, as

reflected by a BMI of 31, does not arise to an extraordinary and compelling reason for release.

In sum, the COVID-19 outbreak at FCI-Elkton and Evans' medical conditions,

considered alone or together, do not constitute an extraordinary and compelling reason for

compassionate release.


C.      Sentencing Commission Policies

The statute requires the court to consider the Sentencing Commission policy on

compassionate release set forth at U.S.S.G. §1B1.13.  Pursuant to the Guidelines Manual, the

court may reduce a sentence if:

> (1)(A) Extraordinary and compelling reasons warrant the reduction; or
> (B) The defendant (i) is at least 70 years old; and (ii) has served at least 30 years
> in prison pursuant to a sentence imposed under 18 U.S.C. § 3559(c) for the
> offense or offenses for which the defendant is imprisoned;
> (2) **The defendant is not a danger to the safety of any other person or to the
> community**, as provided in 18 U.S.C. § 3142(g); and
> (3) The reduction is consistent with this policy statement.

(Emphasis added).

The term "Extraordinary and Compelling Reasons" is defined in U.S.S.G. § 1B1.13,

Application Note 1:

> (A) **Medical Condition of the Defendant**.--
>     (i) The defendant is suffering from a terminal illness (i.e., a serious and
>     advanced illness with an end of life trajectory). A specific prognosis of life
>     expectancy (i.e., a probability of death within a specific time period) is not
>     required. Examples include metastatic solid-tumor cancer, amyotrophic
>     lateral sclerosis (ALS), end-stage organ disease, and advanced dementia.
>     (ii) The defendant is--
>         (I) suffering from a serious physical or medical condition,

14

(II) suffering from a serious functional or cognitive impairment, or
(III) experiencing deteriorating physical or mental health because of
the aging process,

that substantially diminishes the ability of the defendant to provide self-care
within the environment of a correctional facility and from which he or she is not
expected to recover.
(B) **Age of the Defendant**.--The defendant (i) is at least 65 years old; (ii) is
experiencing a serious deterioration in physical or mental health because of the
aging process; and (iii) has served at least 10 years or 75 percent of his or her
term of imprisonment, whichever is less.
(C) **Family Circumstances**.--
(i) The death or incapacitation of the caregiver of the defendant's minor
child or minor children.
(ii) The incapacitation of the defendant's spouse or registered partner when
the defendant would be the only available caregiver for the spouse or
registered partner.
(D) **Other Reasons**.--As determined by the Director of the Bureau of Prisons,
there exists in the defendant's case an extraordinary and compelling reason other
than, or in combination with, the reasons described in subdivisions (A) through
(C).

Evans does not fall within the Medical Condition prong because, although he contracted

COVID-19 and is slightly obese, there is no evidence that his ability to provide self-care within

FCI-Elkton is substantially diminished.  The Age (Evans is 49 years old) and Family

Circumstances prongs are not applicable and Evans did not argue to the contrary.  He, therefore,

must fit into the "other reasons" prong.  The court recognizes that U.S.S.G. § 1B1.13 was not

updated to reflect the First Step Act, and that the Commission's policy statement "does not

constrain a court's independent assessment about whether 'extraordinary and compelling

reasons' warrant a sentence reduction under § 3852(c)(1)(A)."  *United States v. Somerville*, No.

2:12-CR-225-NR, 2020 WL 2781585, at *6-7 (W.D. Pa. May 29, 2020) (court has authority to

independently assess whether there are "extraordinary and compelling reasons" to reduce

defendant's sentence).  For the same reasons discussed above in part IV(B) of this opinion, the

court concludes that Evans did not demonstrate other extraordinary and compelling reasons for

compassionate release.

The government emphasizes the policy consideration about danger to the community. The government argues that Evans represents a danger to the community due to his repeated drug trafficking.  The government points out that Evans received a large downward variance in his original sentence.

The "danger to the community" policy is somewhat similar to the § 3553(a)(2)(C) sentencing factor that a sentence "protect the public from further crimes of the defendant."  As discussed in part IV(A) of this opinion, the court determined that a sentence of 12 years was sufficient, but no greater than necessary, to accomplish that purpose.  The court adheres to that determination.

V. <u>Conclusion</u>

      The court recognizes that Evans was exposed to the COVID-19 virus at FCI-Elkton and actually contracted the disease.  The court is sympathetic to his concerns about his hypertension, obesity, and migraines and possibly getting COVID-19 again.  Speculation concerning possible future conditions, however, does not constitute a "compelling reason" for release.  In other words, his current arguments for release and post-sentence rehabilitation, do not outweigh the factors considered by the court in imposing his original sentence. In accordance with the foregoing discussion, Evans's motion for compassionate release (ECF No. 167) will be DENIED without prejudice to reassert that kind of motion if his medical conditions change or the status of the COVID-19 outbreak at FCI-Elkton changes.

      An appropriate order will be entered.

Dated:  October 20, 2020.

                    /s/ *Robert J. Colville*
                    Robert J. Colville
                    United States District Judge

Cc: Counsel of Record